*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

HAYLEE PORTERFIELD,

          Plaintiff-Appellant,

UNPUBLISHED
May 25, 2023

v

CITY OF MIDLAND,

          Defendant-Appellee.

No. 361411
Midland Circuit Court
LC No. 20-007148-CD

Before: MARKEY, P.J., and MURRAY and FEENEY, JJ.

PER CURIAM.

Plaintiff appeals from the trial court's order granting defendant's motion for summary disposition pursuant to MCR 2.116(C)(10) (no genuine issue of material fact) on plaintiff's employment discrimination claims. We affirm.

Defendant hired plaintiff as a police officer with her start date being February 11, 2019. Her probationary period was 18 months. Porterfield testified in her deposition that she completed the field training program in July 2019. Plaintiff started work on the same day as another new officer, Nathan Neuman.[1] According to Porterfield, during her field training, she heard male officers making negative comments about fellow female officers. This included comments by both her first and second Field Training Officers. Nevertheless, she successfully completed field training on July 20, 2019, though she remained on probationary status. Plaintiff's probation period would have concluded on August 11, 2020, had she not been terminated by Police Chief Ford on June 15, 2020

Plaintiff filed suit, alleging that her termination was due to sex discrimination in violation of the Elliot-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, and due to a perceived disability in violation of the Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1101

---

[1] According to plaintiff, this was due to the department preferring to hire two officers at a time.

*et seq*. Following briefing and argument, the trial court filed a written opinion granting defendant's motion for summary disposition and dismissing the case. Plaintiff now appeals.

A trial court's decision on summary disposition is reviewed de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). *Maiden* explains the standard for motions under MCR 2.116(C)(10):

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Maiden, Supra* at 120.]

Furthermore, a "litigant's mere pledge to establish an issue of fact at trial cannot survive summary disposition under MCR 2.116(C)(10). The court rule plainly requires the adverse party to set forth specific facts at the time of the motion showing a genuine issue for trial." *Maiden*, 461 Mich at 121.

Turning first to plaintiff's claim of discrimination based upon her sex under ELCRA, we are not persuaded that plaintiff has established a genuine issue of material fact. MCL 37.2202(1)(a) provides that an employer shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." As explained in *Hazle v Ford Motor Co*, 464 Mich 456, 462-463; 628 NW2d 515 (2001), where the plaintiff is unable to produce direct evidence of bias, they must first establish a prima facie case of discrimination as set forth in *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973):

> In many cases, however, no direct evidence of impermissible bias can be located. In order to avoid summary disposition, the plaintiff must then proceed through the familiar steps set forth in *McDonnell Douglas, supra* at 802–803. The *McDonnell Douglas* approach allows a plaintiff "to present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination." *DeBrow [v Century 21 Great Lakes, Inc (After Remand),* 463 Mich 534, 537–538; 620 NW2d 836 (2001)]. Although originally created for use in race discrimination cases, we have adopted the *McDonnell Douglas* approach for use in age and gender discrimination cases brought under the Michigan Civil Rights Act as well. See *Lytle v. Malady (On Rehearing),* 458 Mich 153, 172–178; 579 NW2d 906 (1998). Because plaintiff here has offered no direct evidence of race discrimination, she is constrained to rely on the *McDonnell Douglas* framework.

> Under *McDonnell Douglas*, a plaintiff must first offer a "prima facie case" of discrimination. Here, plaintiff was required to present evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she

was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination. *Lytle, supra* at 172–173; see also *Texas Dep't of Community Affairs v Burdine,* 450 US 248, 254, n 6; 101 S Ct 1089; 67 L Ed 2d 207 (1981); *McDonnell Douglas, supra* at 802. [Footnote omitted.]

Here, the trial court concluded that plaintiff did carry her burden of establishing a prima facie case. Accordingly, this is not an issue on appeal.[2]

Once a plaintiff has established a prima facie case, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Hazle*, 464 Mich at 464. At this point, a defendant must produce "evidence that its employment actions were taken for a legitimate, nondiscriminatory reason." *Id.* Once the defendant has done so, the plaintiff bears the ultimate burden of establishing that the evidence, construed in the plaintiff's favor, would support a conclusion that discrimination was the employer's actual motivating factor and that the employer's proffered reason was merely a pretext for unlawful discrimination. *Id.* at 465.

The reasons for plaintiff's termination was detailed in a letter from Chief Nicole Ford to Midland City Manager Brad Kaye and Human Resources Director Carol Stone that recommended that plaintiff's probationary employment be terminated. The letter listed a number of points outlining substandard job performance by plaintiff:

- That plaintiff used a substantial amount of her leave time, that she "earns bank time and then quickly uses it." Chief Ford acknowledged that this was not a policy violation, but atypical of a probationary employee. The Chief also noted that the issue had been raised by a number of other employees. She also raised the concern that plaintiff's response when counseled on this issue was "that all of the critiquing had 'drained her.'"

- That Sgt. Keeler had reported to Lt. Sokol that plaintiff "was starting to get a reputation of avoiding calls, delaying response to calls and not jumping calls." Sgt. Keeler addressed this issue with plaintiff, but the next day plaintiff turned in an activity log with no reportable activity. Keeler told Lt. Sokol that he felt that plaintiff did this to show disrespect.

- In an incident where plaintiff responded to a home invasion call, suspects were identified but not contacted. Plaintiff "completed minimal follow-up and the report was turned in two days after the incident." When Sgt. Mahabir asked her about the incident, plaintiff stated that she was too busy the next day to follow up; her daily log,

---

[2] Defendant does argue that plaintiff failed to establish a prima facie case. In particular, defendant argues that plaintiff failed to establish the fourth element because she did not come forth with evidence that the male officer who replaced her was less qualified.

however, reflected that she had had "ample time to complete the follow-up for this felony investigation."

- In early March 2020, plaintiff developed a medical condition and had to use sick leave and other leave time to cover her missed hours. She requested a light duty assignment which was denied. She was informed that, because of the COVID-19 pandemic, no light duty assignment was available because the department was in the process of implementing protocols to address the pandemic. Plaintiff responded in what Lt. Sokol described as a "sarcastic and disgruntled tone."

- Plaintiff had notified Lt. Sokol that she had applied to the Bay City Department of Public Safety and Lt. Sokol reported getting feedback that plaintiff had been telling others "about how she could not wait to leave MPD."

- That plaintiff had responded to a felonious assault and failed to get all of the required information. She failed to follow-up with the suspect or to arrest him. When this was addressed by Sgt. Mahibir, the shift sergeant, plaintiff became angry and said "can I just go."

- On May 15, 2020, Chief Ford sent out a department-wide email reminding every one of the "Speech, Expression and Social Networking Policy" (in response to an unrelated incident). Two days later, Lt. McMillan received a text from someone that had received a Snapchat group text from plaintiff stating, "F--- the DB, I got written up for not updating a suspect's telephone number." Notably, the message was sent to members within the MPD, as well as to a county deputy and 911 operator.

- The next day, Lt. McMillan was shown a TikTok video by plaintiff referring to "when your sergeant asks u what you've been doing all night," to which she stated, "No, I didn't get that done, but I am almost to 50 followers on TikTok and I can almost nail the savage dance, so I have, I have been working." The video shows plaintiff in uniform in the women's locker room while making the video. There were 17,000 "likes," 164 comments, and 253 shares. The Chief acknowledged that the video was made before the May 15 email, but notes that plaintiff should have made an effort to delete the video once the "reminder" email had gone out but chose not to.

Chief Ford summarized the termination recommendation in her letter as follows:

Ofc. Porterfield's behavior would be concerning if she were a veteran officer, but as a probationary employee, it is alarming and evidence of future problems. Not only did Ofc. Porterfield violate numerous policies (*Standards of Conduct Policy 320.5.8 e, mand 320.5.9 t, v, aa; Personal Communication Device Policy 701.5 e and 701.6 c, e; Speech, Expression and Social Networking Policy 1030.4 b, g*) with her derogatory text and her TikTok video, she violated Midland Police Department's core values of integrity and Professionalism. She has shown a blatant disrespect toward her supervisors and others that wear the Midland uniform. Her behavior brought discredit to the Department and compromised the reputations of all that work for Midland Police Department. It is my

-4-

recommendation that a meeting be scheduled and Ofc. Porterfield's probationary employment is terminated.

The trial court found the Chief's points satisfying the requirement of showing a nondiscriminatory reason for the termination:

> The incidents cited by Chief Ford appear to support her stated reasons for terminating Plaintiff, particularly that Plaintiff violated the social media policy, showed disrespect toward her supervisors, and did not represent the department's values. These are nondiscriminatory reasons that are cumulatively significant enough to reasonably justify a decision to terminate a probationary employee. It is a key point that plaintiff, at the time of her termination, was a probationary employee. While on probation, employees work "at the sole discretion of management." (City of Midland/POAM Collective Bargaining Agreement, Article 12). The purpose of the probationary period is to serve as a working-test period during which the City shall "Decide the ability, qualifications, aptitude, competence, and capacity of a new hire probationary employee to perform the required work." *Id*.

We agree with the trial court that these incidents outlined by Chief Ford in her recommendation for termination provided legitimate, nondiscriminatory reasons for termination. The incidents reflect a lack of the work ethic expected of a probationary employee, significant mishandling of investigative responsibilities, insubordination, policy violations, and conduct unbecoming a police officer.

Once a defendant establishes a nondiscriminatory reason for the adverse employment action, the burden once again shifts back to the plaintiff to establish that the defendant's proffered reason was a mere pretext when, in fact, the actual reason was unlawful discrimination. *Hazle*, 464 Mich at 465. Plaintiff has failed to meet this burden.

> A "mere pretext" may be proved (1) by showing that the reason(s) had no basis in fact, (2) if the reason(s) had a basis in fact, by showing that they were not actual factors motivating the decision, or (3) if the reason(s) were motivating factors, by showing that they were jointly insufficient to justify the decision. However, the soundness of an employer's business judgment may not be questioned as a means of showing pretext. Moreover, unfairness will not afford a plaintiff a remedy unless the unfair treatment was because of . . . discrimination. [*Meagher v Wayne State University*, 222 Mich App 700, 711-712; 565 NW2d 401 (1997) (citations omitted).]

Initially, plaintiff argues that two of the reasons listed in Chief Ford's letter were factually inaccurate. First, plaintiff states that Sgt. Keeler's report that plaintiff turned in an activity log with no reportable activity was false. Indeed, plaintiff indicates that Chief Ford in her deposition admits that it was not true. But plaintiff mischaracterizes Chief Ford's testimony. Chief Ford admitted that it was inaccurate to describe the activity log as having no reportable activity; rather, Chief Ford stated that it should have been described as no "self-initiated field activity." Sgt. Keeler further clarified this in his deposition. He explained the distinction between the area of the daily

log that reports activity to which an officer is dispatched on a call for service and the "Action Category" where self-initiated activity is reported, which in this case was blank. He further reported that he could not recall in his six years as a sergeant seeing a daily report with the "Action Category" being blank except when an officer was in court. We do not view Chief Ford's statement in the letter to be materially inaccurate. Moreover, even if it were, it was based upon an inaccuracy of someone who was not the decision maker and there were other significant factors listed as establishing the reasons for termination.

The second inaccuracy claimed by plaintiff is Chief Ford's discussion regarding the issue of plaintiff being denied light duty by Lt. Sokol in March 2020. Specifically, Chief Ford referenced an email from plaintiff to the Chief that accused Lt. Sokol of denying plaintiff's light duty request because of "personal reasons and not because there was a shortage of work." In her deposition, Chief Ford did acknowledge that plaintiff never accused the Chief or Lt. Sokol of denying plaintiff light duty for personal reasons. There is, however, a certain amount of parsing of words here. In her email to Chief Ford, plaintiff stated that she "was also informed by some officers at our department that they believed I was denied light duty for personal reasons, and not because there was a shortage of tasks for me to do. Given that it is reasonably possible that Chief Ford's interpretation of the statement may have had a veiled accusation in it, we do not find it substantiating a claim of pretext.

Plaintiff also disputes Chief Ford's statement that in a meeting between plaintiff and Chief Ford discussing performance concerns, plaintiff stated that all of the critiquing had "drained her." Even assuming a factual dispute on whether this statement, or one similar to it, was actually made, we fail to see how it was material to the making of the adverse employment action.

Even if we were to accept these allegations of inaccuracies and, like plaintiff, ascribe some sort of ill intent behind them, that would still be inadequate to establish plaintiff's burden of proof showing that defendant's true intent was unlawful discrimination. As indicated in *Meagher,* 222 Mich App at 712, neither poor judgment nor unfair treatment establishes pretext affording a remedy unless it can be linked to an actual motive of unlawful discrimination. Plaintiff argues that this is shown by defendant's failure to follow its progressive disciplinary procedure in its Personnel Policy Manual. Additionally, plaintiff does point to case law that supports the view that an employer's failure to follow its own progressive discipline policy may be evidence of discrimination. See, e.g., *Ensing v Vulcraft Sales Corp, A Division of Nucor Corp*, 830 F Supp 1017, 1020 (WD Mich, 1993).

We do not believe that this argument supports plaintiff's burden of showing discriminatory intent. First, while the failure to follow an establish progressive disciplinary policy may be evidence of discrimination, it is not definitive of discrimination. Second, and more to the point in this case, plaintiff cannot establish that defendant's policy applied to her. The policy itself states that collective bargaining agreements take precedence over the Personnel Policy Manual. And Article 12, section 1 of the collective bargaining agreement (CBA) provides a probationary period of up to 18 months "and at the sole discretion of management." It further provides that the "City shall decide the ability, qualifications, aptitude, competence, and capacity of a new hire probationary employee to perform the required work." And section 2 provides that "Probationary employees are not represented by the bargaining unit for matters of discipline, discharge,

performance standards or evaluation."[3]  Article 40 of the CBA addresses discipline and establishes its own progressive discipline system.  It is not, however, mandatory.  Article 40.1 states that the City "mutually agrees that in general, they will follow the principles of corrective and progressive discipline."  And Article 40.2 lays out the disciplinary system, stating that "Disciplinary action *may* take one of the following forms" (emphasis added).

When the Policy Manual and the CBA are read together, it becomes abundantly clear that the CBA supersedes the Policy Manual with respect to employee discipline.  And it is equally clear that it is a management right under the CBA to evaluate the competence of a probationary employee and determine whether the employee has successfully completed probation or may be terminated before the completion of probation.  Moreover, even if we were to conclude that the progressive discipline system outlined in the CBA applies to probationary employees, the unambiguous language of the CBA establishes that it is a guideline rather than a mandatory procedure.  For that matter, Article 40.10 sets forth a nonexclusive list of reasons that are considered just cause for discharge, including that an officer "is incompetent or inefficient in the performance of the duties of his position," which covers many of the factors set forth in Chief Ford's letter recommending termination.

For these reasons, we conclude that any failure to follow the progressive disciplinary system does not establish a genuine issue of materiel fact of a discriminatory intent by defendant in terminating plaintiff.

Next, plaintiff points to other male employees being treated differently from plaintiff for similar infractions.  The trial court rejected this argument because plaintiff, being a probationary employee, was not similarly situated as the male employees, who were not probationary employees.  Plaintiff rejects the trial court's reliance on *Gibbs v Voith Industrial Services, Inc*, 60 F Supp 3d 780 (ED Mich, 2014), as being outdated.  But the case relied upon by plaintiff, *McMillan v Castro*, 405 F 3d 405 (CA 6, 2005), does not support her claim.  First of all, *McMillan* dealt with the propriety of a jury instruction that the court held did not constitute reversable error.  *Id*. at 414. The court's focus was on whether, to be considered similarly situated, the two employees had to report to the same supervisor.  But the relevant take-away for the case before us is the principle that a court must focus on the relevant aspects of similarity between the plaintiff and the employee who allegedly received more favorable treatment.  *Id.*

Applying that principle to the case before us, we agree with the trial court that plaintiff was not similarly situated with employees who were no longer on probation.  As a practical matter, as the trial court pointed out, defendant's ability to terminate a probationary employee is different from an employee who is no longer on probation.  As Chief Ford summarized in her letter, "Ofc. Porterfield's behavior would be concerning if she were a veteran officer, but as a probationary employee, it is alarming and evidence of future problems."  Indeed, Article 12.1 outlines the purpose of the probationary period:

---

[3] Article 3.1 provides that probationary employees are represented by the union "for all other conditions of employment."

In order that the department head may effectively participate in the selection process involved in the filling of positions covered by this Agreement, there is hereby established a probationary or working-test period. This period shall be up to eighteen (18) months duration after appointment and at the sole discretion of management. The City shall decide the ability, qualifications, aptitude, competence, and capacity of a new hire probationary employee to perform the required work.

Plaintiff also points to a statement by Sgt. Keeler who, after discussing a concern with plaintiff, stated, "I don't want you to believe that this is because you are a female because the last person we had this discussion with was also a female." We are at a loss to understand how a statement that assures someone that the concern is not because of their sex is, without more, evidence that the concern is because of her sex.

Plaintiff further alleges that evidence of pretext arises from reliance on issues raised by Sgt. Keeler which Lt. Sokol supposedly determined to be unfounded. In support of this assertion, plaintiff relies upon an email sent by Lt. Sokol to Sgt. Armstead expressing concerns about what the lieutenant was hearing about plaintiff and questioned the veracity of those issues. This is a mischaracterization of the email. The email that plaintiff refers to simply states that Lt. Sokol had heard "some things" about plaintiff making critical comments regarding "receiving or ignoring work phone calls." Lt. Sokol then asks whether Sgt. Armstead had heard any of those concerns and, if so, how they should be addressed. Sgt. Armstead's response was that he was unaware of any critical comments about work phone calls, as was Sgt. Mahabir, but then referenced some of the other concerns ultimately raised in the Chief's letter. Lt. Sokol's response to Sgt. Armstead was then somewhat positive of plaintiff and indicated that if the rumors were true, he wanted to quickly address them and if not true, to put an end to them. The fact that different sergeants might have a different perspective or experience with a subordinate hardly establishes that the concerns are "unfounded." More to the point of plaintiff's claim, it does not establish a genuine issue of material fact that they were merely a pretext for discriminatory action by the ultimate decision maker.

Plaintiff next points to an admission by Lt. Sokol in his deposition that he lied to plaintiff regarding whether Chief Ford was involved in the discussion regarding plaintiff's request for light duty. While Chief Ford's letter does reference plaintiff informing the Chief that Lt. Sokol had told her that Chief Ford was not involved in the decision, the Chief did not cite that as a reason for terminating plaintiff.

In sum, we are not persuaded that plaintiff has come forth with evidence adequate to create a genuine issue of material fact that the decision to terminate plaintiff's probationary employment as a Midland Police Officer was based upon sex discrimination rather than her performance as a probationary police officer.

Plaintiff's second claim of discrimination is based upon the PWDCRA. MCL 37.1103(a) provides:

Except as provided under subdivision (f), "disability" means 1 or more of the following:

(i) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:

(A) For purposes of article 2, substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

* * *

(ii) A history of a determinable physical or mental characteristic described in subparagraph (i).

(iii) Being regarded as having a determinable physical or mental characteristic described in subparagraph (i).

Plaintiff relies upon this last definition of "disability," that defendant regarded her as having a physical disability arising out of her bout with Bell's Palsy. Our Supreme Court, in *Michalski v Reuven Bar Levav*, 463 Mich 723, 732; 625 NW2d 754 (2001), stated what plaintiff must show to establish her claim:

Thus, while a plaintiff need not actually have a determinable physical or mental characteristic, to qualify as handicapped under subsection (iii), the plain statutory language does require that the plaintiff prove the following elements: (1) the plaintiff was regarded as having a determinable physical or mental characteristic; (2) the perceived characteristic was regarded as substantially limiting one or more of the plaintiff's major life activities; and (3) the perceived characteristic was regarded as being unrelated either to the plaintiff's ability to perform the duties of a particular job or position or to the plaintiff's qualifications for employment or promotion.

Plaintiff has not come forth with evidence to establish a genuine issue of material fact on any of these elements.

Plaintiff relies on references made to her Bell's Palsy, which developed just prior to the beginning of the COVID-19 pandemic. Plaintiff first points to a comment by an employee in Human Resources who reportedly said, "Not a good time to have limitations with eye closure."[4] Plaintiff also relies on a comment by Chief Ford about the Chief's sister having had Bell's Palsy

---

[4] According to plaintiff, even after her other symptoms subsided, she continued to experience a droopy eyelid.

and she knew that some issues could persist, such as a droopy eyelid. And plaintiff refers to a comment by Sgt. Armstead who at one point after plaintiff returned from sick leave asking whether plaintiff was okay as she did not seem to be "one hundred percent lately." Plaintiff also references the statement in Chief Ford's letter recommending termination about plaintiff using leave time in early March 2020 due to her health issue.

We fail to see how any of these comments would establish that defendant regarded plaintiff as having a disability. The comment by the Human Resources employee reflects concern for plaintiff's symptoms, apparently in connection with it happening during the pandemic. Chief Ford's comment about her sister having had a bout with Bell's Palsy reflects understanding, not a mistaken belief that Bell's Palsy creates a disability. As for Sgt. Armstead's comment, as the trial court observed in its opinion, it was made one month after plaintiff's return to work with no restrictions and there is no reason to believe that it was in reference to plaintiff's Bell's Palsy, particularly because plaintiff had never discussed the condition with Sgt. Armstead. And the Chief's comment about plaintiff's using leave time during her illness was in the context of plaintiff's reaction to the denial of the request for a light duty assignment.

Plaintiff also argues that pretext can be established by the fact that concerns about her performance only surfaced after the Bell's Palsy diagnosis. But, as reflected in Chief Ford's letter, concerns with plaintiff's performance actually began at least as early as November 2019, months before plaintiff contracted Bell's Palsy.

Moreover, even if we were to agree with plaintiff that these items reflect that defendant regarded plaintiff's Bell's Palsy as a disability, that only satisfies the first factor outlined in *Michalski*. Plaintiff makes no showing with respect to the other two factors, that defendant regarded the perceived disability as affecting a major life activity or her ability to perform the duties of her job. *Michalski*, 463 Mich at 732. Accordingly, we are not persuaded that the trial court erred in granting summary disposition to defendant on plaintiff's PWDCRA claim.

Affirmed. Defendant may tax costs.

/s/ Jane E. Markey
/s/ Christopher M. Murray
/s/ Kathleen A. Feeney